IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| DAVID TAPIA-TOVAR, ANA MARIA VAZQUEZ, <br><br> Plaintiffs, <br><br> v. <br><br> BRADLEY EPLEY, Deportation Officer, United States Immigration and Customs Enforcement ("ICE") Nashville Fugitive Operations Team (NSVFOT); LEE WORSHAM, Deportation Officer, ICE NSVFOT, JOHN DOE ICE AGENT, Deportation Officer, ICE NSVFOT; GLENN HAMBLEN, Sergeant, Mount Juliet, Tennessee Police Department; and KATHERINE COLLETT, Officer, Mount Juliet Police Department, <br><br> Defendants. | Case No. _____ <br><br> DEMAND FOR JURY TRIAL |

## COMPLAINT

Come now the Plaintiffs, by and through their undersigned attorney, and for their causes of action would state and allege as follows:

### INTRODUCTION

1. This is a civil rights action raising constitutional claims under the Fourth and Fifth Amendment against federal officials pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 401 U.S. 388 (1971), and against state officials pursuant to 42 U.S.C. § 1983, for their participation in the warrantless and unlawful entry, search and seizure of Plaintiffs' home and possessions, and the unlawful arrest of David Tapia-Tovar.

1

## JURISDICTION AND VENUE

2. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343.

3. Venue is proper in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b). Defendants reside within the Middle District of Tennessee, the Plaintiffs reside within the District, and the events giving rise to this action occurred in this District.

## PARTIES

4. Plaintiff David Tapia-Tovar ("Tapia" or "David") is of Latino race, ethnicity, and appearance. At all times relevant to this action, he was a resident of Mount Juliet, Tennessee.

5. Plaintiff Ana Maria Vazquez is of Latino race, ethnicity, and appearance. At all times relevant to this action, she was a resident of Mount Juliet, Tennessee.

6. Defendant Bradley Epley was at all times relevant to this action a Deportation Officer with the U.S. Bureau of Immigration and Customs Enforcement ("ICE") Nashville Fugitive Operations Team ("NSVFOT"). He was responsible for carrying out NSVFOT immigration law enforcement operations and polices, practice, and/or customs of ICE's National Fugitive Operations Program ("NFOP") at all times during this complaint. He took part in the illegal entry and search of Plaintiffs' home and in Plaintiff Tapia's unlawful arrest, and he is the arresting officer of record for Plaintiff Tapia. Defendant Epley is sued in his personal capacity. At all times relevant to this Complaint, Defendant Epley acted under color of federal law.

7. Defendant Lee Worsham was at all times relevant to this action a Deportation Officer with ICE NSVFOT. He was responsible for carrying out NSVFOT immigration law enforcement operations and polices, practice, and/or customs of ICE's National Fugitive Operations Program ("NFOP") at all times during this complaint. He took part in the illegal entry

and search of Plaintiffs' home and in Plaintiff Tapia's unlawful arrest. Defendant Worsham is sued in his personal capacity. At all times relevant to this Complaint, Defendant Worsham acted under color of federal law.

8. Defendant John Doe ICE Agent was at all times relevant to this action an agent of ICE NSVFOT. He was responsible for carrying out NSVFOT immigration law enforcement operations and polices, practice, and/or customs of ICE's National Fugitive Operations Program ("NFOP") at all times during this complaint. He took part in the illegal entry and search of Plaintiffs' home and in Plaintiff Tapia's unlawful arrest. At all times relevant to this Complaint, Defendant acted under color of federal law. Plaintiffs are unaware of the true name and position held by Defendants John Doe ICE Agent. Plaintiffs therefore sue those defendants using fictitious names. Plaintiffs will amend their Complaint to state the true name and position of this defendant once this information is ascertained.

9. Defendant Glenn Hamblen was at all times relevant to the incidents complained of in this action a Sergeant in the Mt. Juliet Police Department. Defendant participated, with Defendants Epley, Worsham, and John Doe ICE Agent, in the illegal entry and search of Plaintiffs' home and in Plaintiff Tapia's unlawful arrest. At all times relevant to this complaint Defendant Hamblen acted under color of state law. Defendant is sued in his individual capacity.

10. Defendant Katherine Collett was at all times relevant to the incidents complained of in this action an Officer of the Mt. Juliet Police Department. Defendant participated, with Defendants Epley, Worsham, and John Doe ICE Agent, in the illegal entry and search of Plaintiffs' home and in Plaintiff Tapia's unlawful arrest. At all times relevant to this Complaint, Defendant Collett acted under color of state law. Defendant is sued in her individual capacity.

## FACTUAL ALLEGATIONS

11. Late in the morning on Sunday, February 7, 2010, Defendant Lee Worsham contacted the Mount Juliet Police Department. Defendant Worsham stated that the ICE Fugitive Operations Team in Nashville would be conducting a "knock-and-talk." Worsham requested to speak with a shift supervisor about obtaining extra law enforcement assistance. The Mt. Juliet Police Department dispatched two officers, Defendants Hamben and Collett, to meet Worsham and two other ICE NSVFOT agents.

12. Around the same time, Plaintiff David Tapia-Tovar ("David" or "Tapia") and his wife, Plaintiff Ana Maria Vazquez ("Ana" or "Vazquez"), were inside their home at 540 Stonehenge Drive in Mt. Juliet, Tennessee. When ICE agents and Mt. Juliet Police officers arrived between 11:00 a.m. and 12:00 p.m., Ana was still in bed asleep.

13. David had just woken up and gone into the living room when he heard a loud banging on the front door of their mobile home. The person who knocked never identified himself. None of the other defendants ever identified themselves as law enforcement.

14. David went to the door. He cracked it open a few inches to see who was knocking. When he opened the door slightly, he saw two men standing on his steps, directly in front of his door. He saw more law enforcement personnel standing behind them. Both men on the steps wore dark vests that read "ICE" in light lettering.

15. Upon information and belief, one of the agents was ICE NSVFOT Deportation Officer ("DO") Bradley Epley. Upon information and belief, another of these agents was ICE NSVFOT DO Lee Worsham. Upon information and belief the third ICE NSVFOT DO, currently named as Defendant John Doe ICE Agent, was Eric C. Lim, Wayne Dickey, Stephen McCormick, Christopher Lane, Agent Abrahamson, or another NSVFOT DO.

16. One of the ICE agents asked David, in English, "Can we speak with you?"

17. David then stepped forward to move outside so he could speak with the agents outside his home. David intended to step outside, close the door behind him, and speak with the agents. As he was stepping forward, David replied, "Yes."

18. As David stepped forward to go outside, an ICE agent stopped him.

19. That agent said, "No, we need to talk inside."

20. David did not have time to respond because the agent stepped forward as he was speaking.

21. This agent pushed the door to David and Ana's home open so he could move David backwards and enter the home.

22. The agent then initiated physical contact with David's body. He pushed David backward and stepped forward, crossing the threshold into David and Ana's home.

23. David did not give this ICE agent consent, express or implied, to enter his home before the agent initiated physical contact and entered the home.

24. As he was moving David backward and stepping into David and Ana's home without David's consent, the ICE agent grabbed David's right arm around his bicep. The agent used his grip on David's arm to spin him around and force him inside into the living room.

25. This ICE agent then forced David down on a sofa in the living room and stood above him.

26. A second ICE agent and Defendant Hamblen followed the first agent inside David and Ana's home. Neither of these officials asked David for consent or permission before entering.

27. The second ICE agent closed the front door behind him after Hamblen entered. Without saying anything to David, both the second ICE agent and Defendant Hamblen began searching David and Ana's home. They moved immediately to the home's back door and opened it for the third ICE agent and Defendant Collett.

28. Both the third ICE agent and Defendant Collett entered David and Ana's home without warrant, consent or exigency.

29. At this point, even though David did not consent to entry or search of his home, the preceding sequence of events -- the first ICE agent's forced entry into David and Ana's home, that agent's grabbing of David's arm, the agent's leading him inside, the agent's forcing him to down on the sofa, the subsequent entry of two more officers, the closing of the front door by the second ICE agent, and the entry into his home from the backdoor by two more officials -- led David to believe he was not free to end the encounter or ask these officials to leave his home.

30. No search warrant for David and Ana's home was ever presented by any of the ICE agents or the Mt. Juliet Police Department officers prior to entry.

31. None of these officers ever indicated to David that any search warrant existed.

32. No administrative or judicial arrest warrant for David, Ana, or anyone else was ever presented by ICE agents or the Mt. Juliet Police Department Officer prior to entry.

33. After entering his home without a warrant, consent, or exigency and forcing him down on the sofa, the first ICE agent stood over David, guarding him, while the others proceeded to search the home.

34. The first ICE agent asked David for identification.

35. Before David could respond, this ICE agent picked up David's wallet, which was sitting on a nearby end table.

6

36. The agent searched and seized David's wallet without David's express or implied consent.

37. As part of this search and seizure, the agent thumbed through the wallet and asked David why he had so many business cards.

38. As part of this search and seizure, the agent found a pay stub inside David's wallet. He asked David where he worked.

39. The agent asked if David or anyone else in the home had any fake documents in their possession.

40. The agent also asked David who lived with him. David replied that he and his wife, Ana, lived in the home with his two brothers.

41. While this question was being asked, David heard the officers opening the door to the bedroom where Ana was sleeping. He stood up to walk back toward the bedroom, and the ICE agent who was questioning followed him, occasionally putting his hand on David's left shoulder. The ICE agent said, "Where's your wife?"

42. As he heard the door being opened, David said loudly, "My wife is in the bedroom without any clothes on."

43. One male officer and Defendant Collett entered the bedroom before David got there. Ana was naked in bed, completely under the covers.

44. David entered the bedroom and indicated again that his wife was under the covers, undressed.

45. Both the Mt. Juliet Police Department officers saw Ana, undressed, though she attempted to cover herself. The female police officer asked Ana if she was dressed. Ana signaled that she was not.

46. Then the first ICE agent ordered David to go back into the living room, and followed him all the way back.

47. The female police officer ordered Ana to hurry up and get dressed and come into the living room where David was.

48. The first ICE agent then handcuffed David and sat him down on the sofa.

49. Both Mt. Juliet Police Department officers stood a few steps inside the bedroom watching Ana as she looked for clothes to put on.

50. A male officer told Ana loudly, in English, to hurry up.

51. As Ana came into the living room, she saw David sitting on their sofa in handcuffs, being interrogated by an ICE agent who stood over him.

52. Another ICE agent demanded identification from Ana. She located her I.D. and handed it to the officer, who ordered her to sit on the sofa.

53. As he sat handcuffed on the couch, David asked the first ICE agent why he and the others had entered their home.

54. In reply, one ICE agent held a file folder a few feet in front of David's face. Attached to the front of the folder was a large photograph of a man of Latino appearance.

55. The man in the photograph bore no resemblance to David. His skin was darker, his nose was wider, and his eyes were set differently.

56. No reasonable person could mistake the man in the photograph for David.

57. Printed on the cover of the ICE folder was the name "David Tovar-Najera."

58. David and Ana had never known or even heard of a person named David Tovar-Najera before this encounter.

59. The first ICE agent conferred with another ICE Agent, who had a folder of his own.

60. The first ICE agent asked the other ICE agent, "What else do you have on this address?"

61. The second ICE agent began asking about vehicles parked outside David and Ana's home.

62. David identified the owners of all the vehicles. None was registered to a David Tovar-Najera. None was registered to David Tovar.

63. One ICE agent showed the photograph to another ICE agent and said, sarcastically, "Looks like him, doesn't it?" The other ICE agent began laughing, and the first agent joined him in laughter.

64. One of the agents told David he was going to be taken to the ICE Office to be fingerprinted so they could determine whether he was the man in the photograph.

65. Several minutes later, the ICE agents removed David from his home, placed him into an ICE vehicle, and drove him to an ICE Office.

66. ICE placed David into removal proceedings. As part of those proceedings, Defendant Bradley Epley, on behalf of ICE, represented to a federal immigration court that permission to enter the residence was granted by David. David did not grant anyone permission to enter.

67. Defendant Epley also represented to the immigration court that David was asked if he had documents allowing him to be in the United States legally, and that David stated he did not. At no time during the encounter at David's home did anyone ask David this or any similar question.

68. Defendant Epley also represented to the immigration court that David stated "he had entered the United States at an unknown time of day and at an unknown location." This, too, is an utter and transparent fabrication.

69. The policy and practice of the Nashville ICE Office is to indicate "unknown time" and "unknown place" of entry into the U.S. when completing ICE database processing of suspected aliens ICE agents encounter.

70. Defendant Epley represented to an immigration court that David just happened to us the precise words that are employed according to ICE Nashville's standard operating procedure.

71. Finally, Defendant Epley did not report any exigent circumstance to the immigration court that would have justified the warrantless, nonconsensual search of David and Ana's home. According to Defendant, the entire exchange was purely consensual, and no exigency presented itself.

72. Plaintiffs' experience is far from unique. Fugitive Operations Teams in Nashville and across the country have a longstanding, well-documented record of conducting warrantless invasions into homes using the pretext of searching for a dangerous criminal alien, then making solely collateral, often race-based arrests of people they are not tasked with searching out and apprehending.

73. Upon information and belief, FOTs in Nashville across the country rarely use administrative warrants to conduct enforcement activities. Instead, their pattern, practice, and custom, is to single out a home or area and conduct "knock-and-talks."

74. The entry, searches and seizures that follow from these knock-and-talks are almost always reported by FOTs as being consensual.

10

75. In reality, FOTs have an extensive history of engaging in a pattern, practice, and custom that involves forcing entry or gaining consent through threats and coercion. Once inside, FOT agents gather subjects into a central area such as a living room and then search the entire home without warrant, consent, or exigent circumstances. Then they arrest residents and take them to ICE administrative offices without probable cause or reasonable suspicion. *See e.g.*, Cardozo Immigration Justice Clinic, Constitution on ICE: A Report on Immigration Home Raid Operations, at 16-22 (2009) (listing similar operations and describing a "uniform national pattern of constitutional violations during ICE home raids) (attached as **Exhibit A**); Margot Mendelson, Shayna Strom & Michael Wishnie, Collateral Damage: An Examination of ICE's Fugitive Operations Program, Migration Policy Institute (2009) (attached as **Exhibit B**); Katherine Evans, *The ICE Storm in U.S. Homes: An Urgent Call for Policy Change*, 33 N.Y.U. Rev. of Law & Soc. Change 561, 583-88 (2009) (quoting a local enforcement official affected by ICE home raids as stating: "In conversations with representatives of ICE, it was reported to me that in all 131 homes they asked for and received consent to enter . . . . In my 29 years of police work, I have executed countless warrants and have sought consent to enter countless homes. ICE's claim that they received 100% compliance with their requests to enter is not credible under even the best of circumstances.") (attached as **Exhibit C**); Marisa Antos-Fallon, *The Fourth Amendment and Immigration Enforcement in the Home: Can ICE Target the Utmost Sphere of Privacy?*, 35 Fordham Urb. L.J. 999 (2008) (attached as **Exhibit D**); Jennifer M. Chacon, *A Diversion of Attention? Immigration Courts and the Adjudication of Fourth and Fifth Amendment Rights*, 59 Duke L.J. 1563, 1588-93 (2010) (attached as **Exhibit E**) (reporting that despite a program review and periodic Fourth Amendment training of Fugitive Operations Teams, home raids have still occurred under the current Administrations and still carry indicia past abuses); Stella Burch

Elias, *"Good Reason to Believe": Widespread Constitutional Violations In the Course of Immigration Enforcement and the Case for Revisiting* Lopez-Mendoza, 2008 Wisc. L. Rev. 1109, 1129-1131 (2008) (attached as **Exhibit F**); Raquel Aldana, *Of* Katz *and "Aliens": Privacy Expectations and the Immigration Raids*, 41 U.C. Davis L. Rev. 1081, 1092, 1110 (2007) (describing the raids' *modus operandi*) (attached hereto as **Exhibit G**).

76. NSVFOT Officers are not immune from the legal strictures governing ICE agents' enforcement activities. Among those strictures are 8 C.F.R. § 287.8(f)(2), which provides:

> An immigration officer may not enter into ... a residence including the curtilage of such residence ... unless the officer has either a warrant or the consent of the owner or other person in control of the site to be inspected. When consent to enter is given, the immigration officer must note on the officer's report that consent was given and, if possible, by whom consent was given ...

77. In addition, Defendants are bound by 8 C.F.R. § 287.8(b)(2), which provides, "[a]n immigration officer, like any other person, has the right to ask questions of anyone as long as the immigration officer does not restrain the freedom of an individual, not under arrest, to walk away." Section 287.8(b)(2) further provides that any immigration officer may briefly detain an individual "only if the officer "has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States."

**FIRST CLAIM FOR RELIEF**
**Fourth Amendment**
(***Bivens***: **ICE Defendants**)

78. The foregoing allegations are incorporated by reference.

79. Plaintiffs have a constitutionally protected right under the Fourth Amendment to the United States Constitution to be free from unreasonable search and seizure. Unlawful invasion of the home is the chief evil the Fourth Amendment seeks to prevent.

80. Defendants Epley, Worsham, and John Doe ICE Agent entered Plaintiffs' residence without warrant, consent or exigency, in violation of Plaintiffs' right to be free from unreasonable searches under the Fourth Amendment to the United States Constitution.

81. Defendants Epley, Worsham, and John Doe ICE Agent investigated, searched, and/or seized Plaintiffs intentionally, knowingly, and without probable cause and /or detained the Plaintiffs intentionally, knowingly, and without reasonable suspicion. In so doing, these Defendants violated the Plaintiffs' right to be free from searches and unreasonable seizures under the Fourth Amendment to the United States Constitution.

82. As a result of these Defendants' actions, the Plaintiffs have suffered damages, including, but not limited to violations of their constitutional rights, loss of liberty, and emotional distress.

### SECOND CLAIM FOR RELIEF
### Fifth Amendment Substantive Due Process
### (*Bivens*: ICE Defendants)

83. The foregoing allegations are incorporated by reference.

84. Plaintiffs have a constitutionally protected right under the Fifth Amendment to the United States Constitution to be free from abusive government conduct that shocks the conscience.

85. Defendants Epley, Worsham, and John Doe ICE Agent civilly arrested, detained without procedural protections, and deprived Plaintiffs of their liberty in a manner that was

without due process of law and was fundamentally unfair in the totality of the circumstances, in violation of the Plaintiffs' rights under the Fifth Amendment to the United States Constitution.

86. The premeditated, forced entry of Plaintiffs' private home, reprehensible disregard for the basic protections of law, and violative intrusion of private spaces constitutes an abuse of state authority that shocks the conscience and offends even the most minimal standards of acceptable behavior.

87. As a result of Defendants' actions, Plaintiffs suffered damages, including but not limited to violations of their constitutional rights, loss of liberty, and emotional distress.

### THIRD CLAIM FOR RELIEF
### Fifth Amendment Procedural Due Process
### (*Bivens*: ICE Defendants)

88. The foregoing allegations are incorporated by reference.

89. Plaintiffs have a constitutionally protected right to be free from unlawful and abusive enforcement activities in violation of statutes and regulations promulgated to protect their fundamental constitutional rights.

90. Defendants Epley, Worsham, and John Doe ICE Agent intentionally, knowingly, and recklessly violated ICE's statutory, regulatory, and sub-regulatory rules governing the conduct of immigration enforcement activities, the entry and search of private homes, and arrests of subjects encountered. These violations include exceeding the power and authority Congress delegated to ICE officers under 8 U.S.C. § 1357. Defendants also violated 8 C.F.R. § 287.8(f)(2) when they entered Plaintiffs' home without warrant, consent, or exigency. Defendants violated 8 C.F.R. § 287.8(b)(2) when they arrested Tapia without probable cause or reasonable suspicion.

91. As a result of Defendants' actions, Plaintiffs suffered damages, including but not limited to violations of their constitutional rights, loss of liberty, and emotional distress.

## FOURTH CLAIM FOR RELIEF
### Fifth Amendment Equal Protection
### (*Bivens*: ICE Defendants)

92. The foregoing allegations are incorporated by reference.

93. Plaintiffs have a constitutionally protected right to be free from discrimination on the basis of their race, ethnicity, or perceived national origin.

94. Defendants Epley, Worsham, and John Doe ICE Agent detained, investigated, searched, seized and/or arrested Plaintiffs, doing so knowingly and intentionally, and motivated by a retaliatory animus against people of Plaintiffs' race, ethnicity, and/or perceived national origin in violation of the equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution.

95. The above-named Defendants deprived Plaintiffs of basic due process protections by targeting them for their race, ethnicity, and/or perceived national origin in violation of their right to Equal Protection under the Fifth Amendment to the United States Constitution.

96. As a result of Defendants' actions, Plaintiffs suffered damages, including but not limited to violations of their constitutional rights, loss of liberty, and emotional distress.

## FIFTH CLAIM FOR RELIEF
### Fourth and Fourteenth Amendments
### (42 U.S.C. § 1983: Mt. Juliet Defendants)

97. The foregoing allegations are incorporated by reference.

98. Plaintiffs have a constitutionally protected right under the Fourth Amendment to the United States Constitution, as incorporated through the Fourteenth Amendment, to be free from unreasonable search and seizures. This right encompasses unconstitutional actions by persons acting under color of state law.

99. By entering Plaintiffs' home without consent or a valid search warrant, and without other circumstances (such as probable cause or exigency) that would render such intrusion reasonable, Defendants Hamblen and Collett violated Plaintiffs' Fourth Amendment rights.

100. As a result of Defendants' actions, Plaintiffs suffered damages, including but not limited to violations of their constitutional rights, loss of liberty, and emotional distress.

101. The actions of Defendants were intentional, malicious, reckless, and reflect a callous disregard for, or indifference to, the civil rights of the Plaintiffs.

## PRAYERS FOR RELIEF

**WHEREFORE,** premises considered, Plaintiff demands:

1. That process issue to the Defendants and that they be required to answer in the time allowed by law.

2. That a declaratory judgment be rendered in favor of the Plaintiffs declaring:

   a) that the warrantless, nonconsensual, and non-exigent entry into their home by Defendants violated their rights under the Fourth, Fifth, and Fourteenth Amendments;

   b) that the warrantless, nonconsensual, non-exigent search of their home without probable cause violated their rights under the Fourth, Fifth, and Fourteenth Amendments;

   c) that the warrantless, nonconsensual, non-exigent seizure of David's wallet without probable cause violated his rights under the Fourth, Fifth, and Fourteenth Amendments;

d) that the warrantless seizure and corralling of David and Ana into their living room without consent, exigency, probable cause, or reasonable suspicion violated their rights under Fourth, Fifth, and Fourteenth Amendments; and

e) that the warrantless arrest and detention of David without reasonable suspicion or probable cause violated his rights under the Fourth, Fifth, and Fourteenth Amendments.

3. That Plaintiffs be awarded those damages to which it may appear they are entitled by the proof submitted in this cause for their physical and mental pain and suffering, both past and future; loss of enjoyment of life; and medical and psychological expenses, both past and future.

5. That Plaintiffs be awarded punitive damages against the Defendants.

6. That Plaintiffs be awarded reasonable expenses in this litigation, including reasonable attorney and expert fees, pursuant to 42 USC § 1988 (b) and (c).

7. That Plaintiffs receive any other further and general relief to which it may appear he is entitled.

Respectfully submitted,

*Elliott Ozment* (signature)

Elliott Ozment, Attorney at Law
Immigration Law Offices of Elliott Ozment
1214 Murfreesboro Pike
Nashville, TN 37212
(615) 321-8888 (O)
(615) 321-5230 (F)
Email: elliott@ozmentlaw.com